**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Case No. 3:24-cr-43-6 |
| | : | |
| v. | : | Judge Thomas M. Rose |
| | : | |
| ANTHONY SMITH, | : | |
| | : | |
| Defendant. | : | |

**ENTRY AND ORDER DENYING MOTION TO SUPPRESS (DOC. NO. 241), DEFENDANT ANTHONY SMITH'S SUPPLEMENT TO DEFENDANT'S MOTION TO SUPPRESS (DOC. NO. 344), AND DEFENDANT ANTHONY SMITH'S MOTION TO SUPPRESS IDENTIFICATION (DOC. NO. 352)**

Presently before the Court are Defendant Anthony Smith's ("Smith") Motion to Suppress (Doc. No. 241), Defendant Anthony Smith's Supplement to Defendant's Motion to Suppress (Doc. No. 344), and Defendant Anthony Smith's Motion to Suppress Identification (Doc. No. 352) (collectively, the "Motions"). In short, this criminal matter involves a multi-defendant drug trafficking conspiracy, implicating Smith as one such conspirator. (*See* Doc. No. 89.) Smith now moves to suppress evidence related to his alleged participation in that conspiracy. (*See* Doc. Nos. 241, 344, & 352.) In particular, Smith seeks to exclude evidence that he was positively identified by undercover law enforcement as a drug trafficker in January of 2024 (Doc. No. 352 at PageID 1976-79), and, he seeks to exclude evidence obtained from his person during a traffic stop on February 7, 2024 (*See* Doc. No. 241 at PageID 1081-86). For the reasons that follow, the Court **DENIES** Smith's Motions, in their entirety.

## I. BACKGROUND[1]

As alluded, this Order concerns Smith's alleged role in a large-scale drug trafficking conspiracy between September 2023 and May 2024. (*See* Doc. No. 89 at PageID 252.) Smith currently sits charged, by Superseding Indictment (Doc. No. 89), with: conspiracy to possess with intent to distribute methamphetamine and fentanyl, in violation of 21 U.S.C. §§ 846 and 841(a)(1)(A)-(C) (*Id.* at PageID 252); knowing and intentional distribution of 50 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(viii), and 18 U.S.C. § 2 (*Id.* at PageID 255); knowing and intentional possession with the intent to distribute 500 grams or more of methamphetamine and 40 grams or more of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 841(b)(1)(B) (*Id.* at PageID 256-57); and, knowing possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (*Id.* at PageID 257).

Law enforcement's investigation here was conducted, in significant part, by Warren County Task Force Officer Greg Spanel ("Officer Spanel"). From late-2023 through to early-2024, Officer Spanel was working undercover to investigate a drug trafficking conspiracy being run from an apartment at 402 West Norman Avenue, in Dayton, Ohio ("402 W. Norman"). (*See* Doc. No. 368 at PageID 2110-12.) As part of his investigation, Officer Spanel frequently consulted with FBI Special Agent Sarah M. Deamron ("SA Deamron"). (*See Id.* at PageID 2114-15.) For Officer Spanel, working undercover largely meant posing as drug buyer and coordinating with alleged traffickers to make purchases of methamphetamine from 402 W. Norman. (*Id.* at PageID 2109-12.) Throughout the majority of Officer Spanel's undercover work in this case, he dealt with

[1] For the sake of clarity, when the Court refers to the Government's exhibits introduced at Smith's suppression hearing, the Court refers to the Government exhibit number and the page of that exhibit, if appropriate. Where the Court refers to body camera footage, the Court shall identify the Government exhibit number and corresponding time stamps.

Jamartay Brown ("Brown")—one of Smith's co-defendants here. (*Id.*) On January 17, 2024, SA Deamron sent Officer Spanel a picture of Smith and asked if he looked familiar, but Officer Spanel responded that he did not recognize Smith. (Gov't. Ex. 2.)

Brown was shot, and, consequently, hospitalized, in mid-to-late January 2024, rendering him unable to sell drugs to Officer Spanel from 402 W. Norman. (Doc. No. 368 at PageID 2112-13.) Although Officer Spanel already knew that Brown had been shot, he called Brown in an effort to maintain his cover. (*Id.*) Brown then referred Officer Spanel to another phone number he could call to acquire methamphetamine from 402 W. Norman. (*Id.* at PageID 2113-14.) Officer Spanel proceeded to coordinate with SA Deamron and arranged a controlled buy from 402 W. Norman. (*Id.* at PageID 2118-20.)

On January 30, 2026, Officer Spanel went to 402 W. Norman to conduct an undercover controlled buy from the individual Brown had referred him to. (*Id.* at PageID 2123-24.) When Officer Spanel arrived at 402 W. Norman, he entered through the back door and into the apartment's kitchen area. (*Id.* at PageID 2124.) The apartment at 402 W. Norman had a shotgun-style design, so Officer Spanel could see straight through the dwelling into the front room from the kitchen. (*Id.*) Beyond the kitchen of 402 W. Norman, Officer Spanel also saw a dining room housing a pool table, where an individual in a paper mask was bagging up drugs and making transactions with people who were ahead of Officer Spanel in line. (*Id.* at PageID 2124-25.) At that time, Officer Spanel was noting physical characteristics he could see, but he could not totally see the individual bagging up drugs because of the paper mask over the bottom of the individual's face. (*Id.* at PageID 2125-27.)

At a certain point while Officer Spanel was inside 402 W. Norman, someone raised suspicions that law enforcement was staking out the apartment. (*Id.* at PageID 2128.) This made

a tense situation for Officer Spanel, but it did give him the opportunity to see the full face of the individual who had been bagging up drugs on the pool table. (*Id.* at PageID 2128-30.) When suspicions were raised, the masked man—later identified as Smith—dropped the paper mask from his face so that it was hanging off one of his ears. (*Id.* at PageID 2130.) Officer Spanel testified that Smith never put the paper mask back on while Officer Spanel was at 402 W. Norman. (*Id.* at PageID 2130-32.)

Once suspicions were assuaged, Officer Spanel purchased eight ounces of methamphetamine from Smith and left 402 W. Norman the way he had come in. (*Id.* at PageID 2134-36.) All told, Officer Spanel was in the apartment for five-to-eight minutes. Upon leaving 402 W. Norman, Officer Spanel texted with SA Deamron, at which time SA Deamron sent Officer Spanel another photo profile of Smith and Officer Spanel positively identified Smith as the individual who had just sold him eight ounces of meth. (*Id.* at PageID 2154-56; *see also* Gov't. Ex. 3 at Page 5-6.) Specifically, Officer Spanel noted matching neck and forehead tattoos, eyes, and skin tone. (Gov't. Ex. 3 at Page 6.) Officer Spanel concluded his conversation with SA Deamron by explicitly stating that he was sure enough of his identification of Smith to testify to it under oath. (*Id.*)

On February 6, 2024, SA Deamron obtained a judicial search warrant for 402 W. Norman, the propriety of which is not in dispute. (*See* Gov't. Ex. 4.) In applying for a warrant to search 402 W. Norman, SA Deamron testified that an undercover officer—i.e., Officer Spanel—purchased methamphetamine from Smith at the residence, identifying Smith by both first and last name. (*Id.* at Page 7.) That warrant was then executed on February 7, 2024. (Doc. No. 368 at PageID 2068.)

The search warrant for 402 W. Norman was executed with the assistance of lower-level

local law enforcement officers. (*See id.*) One such law enforcement officer was City of Dayton Police Officer Brian Rolfes ("Officer Rolfes"), who testified at Smith's suppression hearing. (*Id.* at PageID 2066-68.) Prior to execution of the 402 W. Norman warrant, Officer Rolfes and his colleagues were provided copies of the search warrant and briefed on the operational plan for its execution. (*Id.* at PageID 2068-69.) During their briefing, officers were apprised of the investigation leading to execution of a search warrant and advised on targets of the investigation as law enforcement prepared to enter 402 W. Norman. (*Id.*) For his part, Officer Rolfes was tasked with conducting a traffic stop on any vehicle leaving 402 W. Norman while other investigators searched the residence. (*Id.* at PageID 2069.)

Officer Rolfes and some of his colleagues conducted this traffic stop on February 7, 2024, when they were informed of a black Volkswagen sedan leaving 402 W. Norman. (*Id.* at PageID 2074.) Once the Volkswagen sedan made it a few blocks east of 402 W. Norman, Officer Rolfes and several other City of Dayton police officers stopped the car for bearing fictitious tags and having illegally tinted windows. (*Id.* at PageID 2073-74.) The officers approached the Volkswagen sedan with their guns drawn, with Officer Rolfes covering the sedan's front passenger door. (Gov't. Ex. 1 at 00:30-00:48.) Officer Rolfes ordered the front passenger to exit the vehicle, but the passenger was, at best, lethargic and reaching for his waistband. (*Id.* at 00:48-00:54.) For the sake of officer safety, Officer Rolfes removed the passenger from the Volkswagen sedan by force, handcuffed the passenger, and proceeded to frisk him for weapons. (*Id.* at 00:54-1:35.) While Officer Rolfes did not find any weapons, he did notice that the new detainee was wearing a house arrest ankle monitor. (*Id.* at 1:35-1:39.) When asked to identify himself, Officer Rolfes' detainee said his name was Anthony Smith. (*Id.* at 1:59-2:02.)

Once he handcuffed Smith, Officer Rolfes got consent to empty Smith's pockets and he

placed Smith in the back of a police cruiser. (*Id.* at 1:50-2:35.) Officer Rolfes continued to confirm Smith's identity by running his social security number through police databases. (*Id.* at 2:51-3:51.) In particular, Officer Rolfes commented that Smith was "one of the guys" named in the 402 W. Norman search warrant. (*Id.*) Throughout this encounter, the items in Smith's pockets—two cell phones, a wallet, a small sum of cash, and a set of keys—remained in Officer Rolfes' custody. (Doc. No. 368 at PageID 2086.) Officer Rolfes and his fellow officers eventually transported Smith to 402 W. Norman where the operative search warrant here was being executed. (Gov't. Ex. 1 at 30:47-31:45.) Officer Rolfes continued to detain Smith in his cruiser at 402 W. Norman until handing Smith over to case detectives. (*Id.* at 1:16:30-1:18:11.) Altogether, Smith sat handcuffed in the back of Officer Rolfes' police vehicle for over an hour. The items taken from Smith's pockets were placed in evidence and never returned. Law enforcement ultimately obtained a warrant to search smith's phones. (*Id.* at PageID 2093-94.)

Smith brought the current Motions on June 12, 2025 (Doc. No. 241), May 4, 2026 (Doc. No. 344), and May 21, 2026 (Doc. No. 352), respectively. After several requests for new counsel by Smith, the Court held a suppression hearing in this matter on July 7, 2026. (*See* Doc. No. 364.) The Parties have subsequently ordered a transcript of that hearing and submitted supplemental briefing regarding Smith's instant Motions. (Doc. Nos. 372-374.) Accordingly, the Court now considers Smith's Motions to be ripe for review and decision.

## II. ANALYSIS

Broadly, a criminal defendant may seek the suppression of evidence by filing a pretrial motion with the Court. Fed. R. Crim. P. 12(b)(3)(C). "It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003). At bar, Smith seeks to suppress evidence related to Officer Spanel's identification

of him in January 2024, and evidence obtained as a result of Officer Rolfes seizing the contents of Smith's pockets on February 7, 2024. (*See* Doc. No. 372 at PageID 2170.) The Court considers both of these categories of evidence in turn.

### A. Identification of Smith

The Court looks first to the assertion that Officer Spanel's identification of Smith was unduly suggestive. On this front, Smith argues that Officer Spanel's identification was suggestive because of the photo profiles introduced to Officer Spanel by SA Deamron. (Doc. No. 372 at PageID 2172-73.) Smith contends that SA Deamron's photo profiles must have been suggestive because they called on Officer Spanel to identify a complete stranger to him. (*Id.*) Otherwise, Smith posits that Officer Spanel's identification is unreliable because he only purportedly met Smith while making a controlled buy from a known drug house. (*Id.* at PageID 2173.) Such circumstances, Smith says, are dangerous and intense. (*Id.*) Smith claims that Officer Spanel could not be expected to reliably identify him under those conditions. (*Id.* at PageID 2173-74.)

In retort, the Government avers that Officer Spanel's identification of Smith was neither suggestive nor unreliable. According to the Government, SA Deamron did not send Officer Spanel photo profiles of Smith to make an identification, but as part of the substantive drug trafficking investigation the two officers were collaborating on. (Doc. No. 373 at PageID 2182.) Moreover, on the issue of reliability, the Government suggests that Officer Spanel had ample opportunity to observe Smith while purchasing drugs from him at 402 W. Norman. (*Id.* at PageID 2183-84.) In support of this argument, the Government notes Officer Spanel's extensive training and experience in undercover operations, and the fact that Officer Spanel positively identified Smith within mere hours of buying methamphetamine at 402 W. Norman on January 30, 2024. (*Id.* at PageID 2184-85.)

Where evidence in a criminal matter is concerned, the Supreme Court has recognized a "constraint tied to the Due Process Clause," requiring the suppression of evidence that "is so extremely unfair that its admission violates fundamental conceptions of justice." *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012) (internal citations and quotation marks omitted). To that effect, out-of-court identifications of a criminal defendant may need to be excluded from evidence if the identification procedure used "was so unnecessarily suggestive and conductive to irreparable mistaken identification that [the defendant] was denied due process of law." *Neil v. Biggers*, 409 U.S. 188, 196 (1972) (citing *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967)) (internal quotation marks omitted). Courts are to consider the propriety of such an out-of-court identification based on a totality of the circumstances. *Id.*

It is important to note though that unnecessary suggestiveness alone will not require exclusion of an identification. *See id.* at 199. Rather, "reliability is the linchpin in determining the admissibility of identification testimony …." *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). What emerges is a two-part inquiry. In the context of identification, due process concerns will first be triggered where an identification procedure "is both suggestive and unnecessary." *Perry*, 565 U.S. at 238-39 (citations omitted). If identification procedures were unnecessarily suggestive, courts are required to discern whether the identification is nonetheless reliable. *Id.* at 239. An out-of-court identification will then only be suppressed "[w]here the indicators of a witness' ability to make an accurate identification are outweighed by the corrupting effect of law enforcement suggestion …." *Id.* (citations omitted) (cleaned up). In the end, "the primary evil to be avoided" with respect to suggestive identification "'is a very substantial likelihood of irreparable misidentification.'" *Neil*, 409 U.S. at 198 (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)).

To determine whether an out-of-court identification is reliable, the Supreme Court has advised lower courts to consider several factors aimed at "evaluating the likelihood of misidentification …." *Id.* at 199. In particular, courts should consider "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.* at 199-200.

In Smith's case, even if the Court were to find that the procedures used to identify Smith on January 30, 2024, were unnecessarily suggestive, Officer Spanel's identification of Smith was reliable all the same. Officer Spanel identified Smith after spending five-to-eight minutes with him inside 402 W. Norman. Indeed, Smith's face was clearly visible to Officer Spanel for most of this interaction, after Smith dropped his paper face mask. Further, even when Smith was wearing his paper mask, Officer Spanel was able to accurately note characteristics like Smith's tattoos, his eyes, and his skin tone. The Court also finds that Officer Spanel was exhibiting a heightened degree of attention while inside 402 W. Norman. As was the case in *Manson*, Officer Spanel entered 402 W. Norman on January 30, 2024, as a trained undercover officer who "could be expected to pay scrupulous attention to detail, for he knew that subsequently he would have to find and arrest his vendor." *See Manson*, 432 U.S. at 115. To be sure, when Officer Spanel identified Smith, he did so with absolute certainty, stating that he would readily testify to his identification of Smith under oath. Indeed, as the Government notes, Officer Spanel quickly identified Smith as the individual he purchased drugs from at 402 W. Norman within mere hours on January 30, 2024.

With each of these factors indicating the reliability of Officer Spanel's identification, the totality of the circumstances here militate against suppression of that identification, even if it might have been unnecessarily suggestive. Therefore, the Court **DENIES** Smith's Motions insofar as he seeks to suppress Officer Spanel's January 2024 identification of him.

### B. <u>Traffic Stop and Accompanying Search and Seizure</u>

Next, Smith argues for the suppression of evidence taken off of his person in the course of the February 7, 2024, traffic stop conducted by Officer Rolfes and his colleagues; namely, Smith's two cell phones and keys. (Doc. No. 372 at PageID 2171-72.) To best contextualize Smith's positions, the Court first considers the lawfulness of the February 7 traffic stop and Officer Rolfes' prolonged detention of Smith. After examining that bit of context, the Court considers how lawful it was for Officer Rolfes to empty Smith's pockets and never return his belongings.

#### i. <u>The Traffic Stop and Prolonged Detention</u>

As it pertains to the traffic stop Officer Rolfes and his cohorts made on the Volkswagen sedan Smith was travelling in on February 7, 2024, Smith claims that the officers lacked probable cause to stop the vehicle and lacked reasonable suspicion to justify Smith's prolonged detention. (*Id.*) Smith says that, because Officer Rolfes did not have reasonable suspicion or probable cause to believe that Smith had committed a crime, Officer Rolfes' decision to empty Smith's pockets constituted an unreasonable seizure. (*Id.*)

Fundamentally, the Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. CONST. AMEND. IV. The detention of an individual by law enforcement, no matter how brief, is regarded as a seizure of the individual's person, under the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-10 (1996). Whether a detention is reasonable within the meaning of the Fourth Amendment is determined from a totality of the circumstances. *United*

*States v. Warfield*, 727 Fed. App'x. 182, 186 (6th Cir. 2018) (quoting *United States v. Ferguson*, 8 F.3d 385, 391-92 (6th Cir. 1993)).

Law enforcement's decision to stop an automobile and detain its occupants is reasonable, *per se*, when the officer has "probable cause to believe that a traffic violation has occurred" in his presence. *Whren*, 517 U.S. at 810. An officer who observes a traffic violation will certainly have probable cause to initiate a traffic stop in response to that violation. *Id.* at 817 (quoting *Delaware v. Prouse*, 440 U.S. 648, 659 (1979)) ("[T]he foremost method of enforcing traffic and vehicle safety regulations … is acting upon observed violations") (internal quotation marks omitted). Additionally, an officer may initiate a traffic stop based on probable cause without personal knowledge when a basis for probable cause has been communicated to him by his fellow officers. *U.S. v. Hensley*, 469 U.S. 221, 231 (1985). Officers "cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information." *Id.* (internal citations and quotation marks omitted).

So long as this requisite probable cause exists, an officer's pretextual reason for initiating a traffic stop is largely inconsequential. *See Whren*, 517 U.S. at 813 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis"). Rather, "the Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the [officer's] subjective intent." *Id.* at 814 (emphasis in original).

Once an officer has lawfully detained a vehicle's occupant pursuant to a traffic stop, the officer may take certain actions to preserve his own safety. *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977). This includes ordering drivers and passengers out of the vehicle. *U.S. v. Ware*, 465 F. App'x. 487, 494 (6th Cir. 2012) (citing *Mimms*, 434 U.S. at 111, n. 6) ("[T]he legitimate and weighty interest in police officer safety outweighs the *de minimis* additional intrusion of requiring

a driver who is already lawfully stopped to get out of the car," and this "rule applies to passengers just as it does to drivers"). Based on similar rationale, an officer conducting a stop may, upon reasonable suspicion that the individual seized might be armed, pat down his detainee for weapons. *See Terry v. Ohio*, 392 U.S. 1, 29 (1968). Such a pat down must be "confined in scope to an intrusion reasonably designed to discover [weapons]." *Id.*

Here, the initial stop of the black Volkswagen sedan carrying Smith was lawful, as was Officer Rolfes' pat-down and initial detention of Smith. Smith's vehicle was stopped based on probable cause that the vehicle bore fictitious tags and had illegal window tint. This is clearly a lawful justification for the stop. That Officer Rolfes and other officers came upon the occupants of the Volkswagen sedan with their guns drawn might have been overkill, but their behavior was informed by reasonable suspicion. All officers involved in the traffic stop knew that the Volkswagen sedan was coming from a suspected drug house and it would have been logically consistent to suspect that individuals associated with a drug house might be armed and dangerous. In that vein, it was perfectly reasonable for Officer Rolfes to order Smith out of the car and pat him down to ensure officer safety. Hence, the initial traffic stop and Smith's initial period of detention here were lawful.

Still, after "the purposes of the initial traffic stop [are] completed," officers cannot prolong the stop unless the events of the traffic stop gave rise to reasonable suspicion justifying continued detention. *U.S. v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995). This is a low bar, as "[r]easonable suspicion requires only that the officer have 'a moderate chance' of finding evidence of illegality on further investigation." *United States v. Williams*, 68 F.4th 304, 308 (6th Cir. 2023) (quoting *United States v. McCallister*, 39 F.4th 368, 373-74 (6th Cir. 2022)).

In any event, law enforcement cannot hold onto a detainee indefinitely on reasonable suspicion of criminal activity alone. *See Fisher v. Harden*, 298 F.3d 837, 844 (6th Cir. 2005). "If, through the passage of time or use of force, an investigative detention ripens into an arrest, a suspect's continued detention *must* be based upon probable cause." *Id.* (citation and internal quotation marks omitted) (emphasis in original). To determine whether an investigative stop has ripened into an arrest, courts are to look, in pertinent part, at "whether the length and manner of the investigative stop was reasonably related to the basis for the initial intrusion." *Id.* (citation and internal quotation marks omitted) (cleaned up).

Here, Officer Rolfes' prolonged detention of Smith can only be briefly characterized as part-and-parcel of an investigative detention. When Officer Rolfes removed Smith from the Volkswagen sedan, he did so forcefully because Smith was reaching for his waistband and ignoring officer commands. This rightfully piqued Officer Rolfes' reasonable suspicion that Smith might be armed and dangerous. Further, when Smith was being handcuffed, Officer Rolfes noticed that Smith was wearing an ankle monitor. Based on the ankle monitor, Officer Rolfes would have had sufficient reasonable suspicion to detain Smith long enough to ascertain whether Smith was in compliance with his probation conditions. *See Williams*, 68 F.4th at 308 (citing *United States v. Navarette*, 996 F.3d 870, 875 (8th Cir. 2021)).

However, Smith remained detained in the back of Officer Rolfes' cruiser well beyond the shelf life of Officer Rolfes' reasonable suspicion. As stated earlier, Smith was detained for over an hour and, in that time, was transported from the location of the traffic stop to a secondary location—402 W. Norman. Consequently, the Court finds that Officer Rolfes' prolonged investigatory detention of Smith on February 7, 2024, ripened into a full *de facto* arrest when he and his fellow officers transported Smith back to 402 W. Norman.

Regardless, Smith's *de facto* arrest was supported by probable cause. Officer Rolfes and his colleagues were briefed on the 402 W. Norman search warrant before initiating a traffic stop in this case. That warrant expressly named Smith, by first and last name, as an individual who sold large quantities of methamphetamine to an undercover officer. So, when Smith gave Officer Rolfes his name, and, when Officer Rolfes confirmed Smith's identity, Officer Rolfes knew or had reason to know that the individual sitting in the back of his cruiser had sold drugs to an undercover officer. In other words, upon identifying Smith, Officer Rolfes had probable cause to believe that Smith had previously committed a crime. *See United States v. Keith*, No. 08-cr-360, 2010 WL 58988, at *5 (N.D. Ohio Jan. 6, 2010) (citing *United States v. Hinson*, 585 F.3d 1328, 1334 (10th Cir. 2009); *United States v. Wells*, 347 F.3d 280, 288 (8th Cir. 2003)) (finding probable cause to arrest based on evidence of prior drug transactions). As a result, Officer Rolfes was within his authority to arrest Smith as soon as Smith identified himself. Accordingly, the Court finds that Smith's prolonged detention on February 7, 2024, did not run afoul of the Fourth Amendment.

**ii. <u>Search of Smith's Person</u>**

In keeping with the notion that Smith was in fact under arrest when he was placed in the back of Officer Rolfes' police vehicle the Court finds that it would be improper to suppress the evidence taken from Smith's pockets. Even if the Court were to find that Smith's consent to empty his pockets was not operative, the contents of Smith's pockets would have inevitably been discovered.

"'[T]he inevitable discovery exception to the exclusionary rule applies when the government can demonstrate either the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence or other compelling facts establishing that the disputed evidence inevitably would have been discovered.'" *United States v. Alexander*, 540 F.3d

494, 502 (6th Cir. 2008) (quoting *United States v. Kennedy*, 61 F.3d 494, 499 (6th Cir. 1995)). "The inevitable discovery doctrine 'requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred.'" *Id.* (quoting *Kennedy*, 61 F.3d at 498).

The Court has already found that Officer Rolfes and his fellow officers had probable cause to arrest Smith on February 7, 2024, and they did effectively arrest him by prolonging his detention. It is axiomatic that officers making a lawful arrest based on probable cause may conduct a search incident to that arrest. *See U.S. v. Riley*, 410 F. App'x. 963, 966 (6th Cir. 2011). Because Smith was arrested for probable cause, his pockets would have inevitably been searched incident to arrest as a matter of course if Officer Rolfes had not emptied Smith's pockets when he did. It is not as though probable cause to arrest Smith arose out of the items taken from his pockets. Rather, the probable cause was derived from Smith's past criminal behavior, which was uncovered by lawful means. Hence, the evidence obtained from Smith's person on February 7, 2024, was subject to inevitable discovery and the Court, thus, **DENIES** Smith's Motions to the extent that they seek the exclusion of such evidence.

## III. CONCLUSION

In accordance with the foregoing the Court hereby **DENIES** Smith's Motion to Suppress (Doc. No. 241), Defendant Anthony Smith's Supplement to Defendant's Motion to Suppress (Doc. No. 344), and Defendant Anthony Smith's Motion to Suppress Identification (Doc. No. 352).

**DONE** and **ORDERED** in Dayton, Ohio, this Monday, October 26, 2026.

s/Thomas M. Rose

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE